STARK v. GEORGE. (No. 8115.)*

(Court of Civil Appeals of Texas. Galveston. Feb. 11, 1922. Rehearing Denied Feb. 16, 1922.)

1. Sales ⚓288(2) — Retaining machinery a waiver of right to rescission or damages for breach of warranty.

Where a contract of sale and warranty provides for the making of a test of machinery, and that the retention of the machinery after such test shall be deemed the complete fulfillment of the warranty, the buyer, after making such test and using the machinery for a long period of time, waives both his right to rescind and his right to damages for an alleged breach of warranty.

2. Judgment ⚓256(3)—Need be based only upon material findings, and not on findings on irrelevant facts.

The rule that the judgment must follow the verdict of the jury requires only that it must be based upon findings material to the matter in controversy, and does not demand that it shall be rendered in accordance with findings upon facts not material and relevant to the issues as made by the pleadings and evidence, and which, though true, would not enti-

tle the party in whose favor they were found to any judgment.

**3. Appeal and error ⟐1073(1)—That trial court ignored immaterial findings of jury in rendering judgment not reversible error.**

When from the pleadings and undisputed evidence it is apparent that no judgment could be properly rendered for either party from the findings of the jury, it is not error for the court to ignore the findings in rendering judgment, and if, from the pleadings and evidence, no judgment other than the one rendered could be properly rendered, the appellate court will not reverse because not in conformity to findings of the jury upon immaterial issues.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Suit by R. B. George against L. D. Stark. From judgment for plaintiff for part of relief prayed for, defendant appeals, and plaintiff files cross-assignments. Reformed and affirmed.

Cooper & Merrill, of Houston, for appellant.

Hunt & Teagle, of Houston, for appellee.

LANE, J. This suit was brought by appellee, R. B. George, against appellant, L. D. Stark, to recover upon two promissory notes, each for the sum of $1,345.00, dated July 23, 1917, together with interest and attorney's fees, and for a foreclosure of a mortgage lien upon one traction engine, one oil tank, and certain other property described in the plaintiff's petition. Both of said notes, on their face, were made payable to the order of the Twin City Company, a Minnesota corporation, and by transfer made payable to appellee George.

The defendant, L. D. Stark, sought to defend upon the allegations: That the notes sued upon were given as part of the purchase price of the above-mentioned property, which was sold to him by one C. S. Durham, subagent for appellee George, who was in such sale acting as state sales agent for the Twin City Company. That the property so sold consisted of an oil burning tractor, one set of plows and an oil tank, for which appellant agreed to pay the total sum of $4,035. That the consideration to be paid for said articles were as follows: For the tractor, $3,300; for the plows, $608; and for the tank, $127. That notwithstanding these agreed prices, appellant actually paid to said company $1,470, cost, and executed and delivered the two notes sued upon, aggregating $2,690, and in addition thereto paid the freight on the plows, amounting to $90.72, thereby paying $215.72 in excess of the contract price. That said tractor, plows, etc., were sold under a written contract consisting of one of the printed forms of the Twin City Company, upon the back of which was printed the following warranty:

"The seller warrants the machinery for one year to be well made of good material and durable if used with proper care. If within one year from date of shipment of said machinery, any part shall fail by reason of defective material or workmanship, the Twin City Company will furnish a new part free of charge f. o. b. factory, provided the broken part is delivered to the factory of the said company, transportation prepaid, with satisfactory evidence that its failure was due to defective material and workmanship.

"The tractor is further warranted to develop its full rated horse power when properly operated, under favorable conditions.

"If upon three days' trial after the said machine is first started, with proper care and under favorable conditions, it fails to work, the purchaser shall immediately give notice by registered mail or wire to the seller at its office in Minneapolis, Minnesota, and to the agent through whom it was purchased, stating wherein the machine fails, and shall allow a reasonable time for a competent man to be sent to put it in good order, and the purchaser shall render necessary and friendly assistance to operate it. If the machine cannot then be made to work under ordinary conditions, the purchaser shall immediately return it to said agent in as good order as when received (except for ordinary wear). The company will either furnish another machine with the same above warranty or (at its option) all cash and notes paid on the purchase price shall be forthwith refunded to the purchaser, which shall constitute a settlement in full of both buyer and seller arising out of this contract. Failure to give notice within the three days specified shall operate as an acceptance of said machine and a complete fulfillment of this warranty.

"The spark plug, magneto and belting are of standard make, and the buyer is protected by the manufacturer's warranty only.

"The above warranty does not apply to secondhand machinery, all of which is sold without warranty of any kind.

"This instrument comprises the entire contract between the parties hereto, and any verbal representations and agreements outside of, or contradictory to, the foregoing terms and warranty are hereby agreed to be void for all purposes whatsoever."

That had said tractor been in compliance with the warranty, it would have been of the reasonable market value of $3,300, but that in truth and in fact it was not well made, of good material, and was not durable or suitable for the purpose for which it had been purchased, and was not worth exceeding the sum of $500. That appellant had expended for repairs, which under the terms of his contract he was entitled to have furnished free of cost and which became necessary as the result of his efforts to operate the defective machine, a sum in excess of $200.

Appellant sought by this pleading to offset against the notes sued upon the damages occasioned by the breach of the warranty, consisting of the difference between what the tractor was actually worth and what it would have been worth if it had been as warranted, and also the $200 expended by him in the purchase and replacement of defective parts. He also sought credit for the said sum of $215.72 excess payment. He alleged that the tractor so sold to him was not such as was warranted, in that it was defective in workmanship and material.

By his first supplemental petition appellee admitted the execution of the warranty pleaded by appellant, and alleged full compliance on the part of the seller with the terms and provisions thereof, but that the defendant L. D. Stark, had wholly failed to comply with the obligations incumbent upon him in the contract of sale and warranty, in that the contract and warranty required him to test the machine, and within three days to give to the Twin City Company, or its duly authorized agent, notice of any defects in materials or parts or that the machine was not satisfactory. That the defendant did test said machine, used it in plowing his lands, gave no notice of dissatisfaction, returned no parts to the factory, and made no complaint of any kind until after his first note fell due and about 15 months after the delivery to him of the engine in question. That by reason of the long and continued use of said machine, without complaint, the defendant had accepted the same as satisfactory, and waived any claim for a breach of the warranty and was estopped from claiming either rescission or damages for the alleged breach of warranty.

Appellant, Stark, testified that he purchased the tractor in controversy from one C. S. Durham, subagent of George, for which he executed the two notes in part payment; that the tractor worked all right when he first got it, and did so for about three weeks; that Durham worked with them a few days, and taught appellant's son how to run the engine; that after the first two weeks they did a good deal of work with the tractor, and that it worked all the fall' of 1917, but that they had a good deal of trouble with it, and they had Mr. Boren, a hired man, to work on it and fix it when it got out of repair; that the principal trouble he had that fall was with the bearings; that to enable him to operate it that fall he had Mr. Boren, who operated it, to fix it by putting in new bearings; that during the fall of 1917 they broke about 500 or 600 acres of very hard land with the tractor, and that in the spring of 1918 he put in 200 or 300 acres of wheat, that is, that the tractor broke about 600 acres in the fall of 1917 and 300 acres in the spring of 1918; that C. S. Durham helped him at times during the fall of 1917 and spring of 1918

when anything got wrong with the tractor, and that when he wanted any piece or part of the machinery Mr. Durham would get it for him, and that he (appellant) paid for it; that he could not name one part that he demanded of Mr. Durham, or of Mr. R. B. George, or of the Twin City Company during the first year that they did not furnish to him; that neither he or his sons knew anything about farm machinery or oil tractors in 1917, except what information they received from Mr. C. S. Durham, who sold him the tractor; that after Durham showed them how to run the tractor they ran it between two and three weeks, and were running it when they blew out the cylinder head; that he did not know what caused the cylinder head to blow out; that it blew out in the latter part of September, 1917; that he did not keep the tractor under cover, but permitted it to stand out in the weather at all times, all through the winter of 1917–18 and spring and summer of 1918; that he at no time made complaint to either the Twin City Company or R. B. George, with reference to the tractor, but that he had asked Mr. Durham to write to said parties about the matter, and he (Durham) promised to do so. He admitted, however, that he did write a letter to the Twin City Company on October 7, 1918, in which he said:

"10/7/18.

"I received your letter on the 5 of this month in regard to your note you have against me. I tryed to get commutation [witness said he meant 'communication'] with you in July through your agent at Plainview, as C. H. Durham was gone, and I failed. In August C. H. Durham came back & I told him to write you in regard to the tractor. Have not heard any-thing untill I received your letter.

"My address is Whitfield, Swisher Co., Texas.
"As ever,          L. D. Stark."

He testified that said letter was the only letter he had written with reference to the property in controversy.

Mr. T. K. Boren, witness for the defendant, testified that he went to work for appellant, Stark, in October, 1917, and that at that time the thing he noticed wrong about the tractor engine was that the center bearing was gone and all the bearings were loose; that they quit trying to use the engine to sow wheat about the latter part of December, 1917, and that he ran it out to the shop until some time in' January, 1918, at which time he worked it over; that he did not know how much planting they did with the engine in the spring of 1918; that they tried to plant with it up to the latter part of May, 1918, and then Mr. Stark told him to run it in. Testifiying further, this witness said:

"It is my opinion that the whole trouble arose because the crank shaft was crooked. I thought so at the time I went there in the fall or winter of 1917. At the time I worked on that engine and decided that the crank shaft was

probably crooked or twisted, I told Mr. Stark what I thought was wrong with it; we discussed it a number of times. When I went out at about the 1st of October, 1917, all the bearings were loose.

"If the bearings were all right, the crank shaft such as the one on that engine is not apt to become twisted from heavy work. If you let the bearings get loose, the crank shaft might get twisted or crooked even though it was straight at first; that is, if a bearing was to knock out. I examined the bearings then; they were in bad shape then, the bearings were. That applied to all the bearings. Babbitt metal would wear out after long use even though there is no crank shaft twisted or out of alignment. * * * If you don't take up the looseness in the bearings you are apt to get your crank shaft twisted or out of alignment. You can go on and let your bearings get loosened up, it will be more apt to warp it than become twisted; warping it would be getting it out of alignment." That bearings would wear out after long use in any event; that they do not last the same length of time. That the ordinary wear on bearings are taken care of by taking them up a little, and that unless this is done the crank shaft would be apt to get twisted or out of alignment. That it would be apt to get warped if worked with the bearings loose.

Appellant introduced in evidence a copy of the contract, hereinbefore set out, and, upon being recalled, testified:

"That the regular price of the oil tank was about $127; that the engine was to cost him $3,300, and plows $608, which would total $4,035 for the outfit. That he paid $1,470 in cash, and executed the two notes for $1,345 each, making a total of $4,160, which was $135 more than he had contracted to pay. That Durham claimed it was necessary for him to make this payment in order to get the machine delivered. That he stated he would refund it as soon as the papers could get to the head office and back. That he also paid the freight on the plows, amounting to $90.72."

N. B. Pelton, for plaintiff, testified:

"That he was acquainted with the different parts of said machine from a printed catalogue; that the selling price of a crank shaft, for a 25 horse power Twin City tractor was at the date of the trial $132, and would have been in 1917 $120; that those crank shafts are not kept in stock so that a man could purchase them in Houston; that he could not say where they could be gotten, but that they could be purchased from Minneapolis; * * * that the price of $120 would be the price of a crank shaft f. o. b. Minneapolis; that the customer would pay that price for it, and then pay the freight on top of that; that a crank shaft for such a machine weighs 188 pounds; it is a big heavy crank shaft for a four cylinder engine."

C. S. Durham, for plaintiff, testified:

"I operated the machinery a couple of days after its delivery to Stark, and showed his boys how to handle it. I know Stark used said machinery in 1917 and 1918 in general work on the farm. The last time I saw the engine was in May, 1918. I was not closer than 150 or 200 yards to the engine at this time, but it was running, pulling listers, as I remember. After said machinery was delivered to Stark it was four or five days before I talked with him again about the machinery. Mr. Stark first complained about the engine not working, or that there was something wrong with it about a year after he bought it.

"Mr. Stark asked me for a pull chain and a fan. I furnished these and paid for them myself. He never asked me to report to the company that any part of the engine was defective. I had no complaints from Stark regarding this machinery, except as hereinbefore stated.

"Mr. Stark delivered a fan and some pump chain and sprockets to me in December, 1917, and I furnished him with new ones and put them on for him. He never asked me for anything else. Some few times Mr. Stark called for my assistance, trouble in starting, dirty spark plugs, etc. I never found anything serious with the engine except the time he filled the red hot cylinder with water and burst it."

C. E. Renfro, a sales agent for the Twin City Company, testifying in behalf of appellee, said:

"I never received any complaint from Mr. Stark as to the engine, machinery, or any of the stuff sold to him until I went to him to collect the first payment thereon, which payment was past due at the time. It was some time in October of 1918 that I talked with Stark after the delivery, over a year after the delivery of the machinery. * * * This was the first time that I ever heard of any complaint whatever on the part of Stark relative to the machinery sold him. I had had several conversations with Mr. Stark in Amarillo prior to the time I went to collect the money; he never made any complaint relative to the machinery sold him except the time I went to collect a payment on it, as stated. I examined the engine when I went to collect from him. The engine was in bad condition; it was run down and rusty and operated without attention. It was out in the weather, not under any cover. The ends of the crank shaft were loose, and of course it would hammer out the bearings and cause vibration to an excessive degree in the motor.

"The fuel tank had been removed from its location underneath the platform and put in front of the radiator, which prevented the air from circulating through the radiator, which, of course, caused the engine to run hot. The piston pins were worn out because of the shims not having been adjusted. The case to the governor was gone or lost and the oiler was missing or gone. The dust retainer cap to one wheel was missing and the bushing and spindle of that wheel was badly worn. The crank case was standing open and was full of dirt and sand. The rivets in the frame were loose, caused from excessive vibration of the motor in running the engine. The condition was in no wise brought about by faulty construction or workmanship in the manufacture of the engine.

"During the first year he had this engine, the defendant made no demand for repairs or parts except that he ordered and paid for some minor parts. He never demanded replacements. During the period of July, 1917, to July, 1918, de-

fendant did not ask for an expert to assist him in operating said machine, or place it in running order, or for any other assistance or repairs or any replacement of any kind. I had not heard of any trouble with the machinery prior to the conversation in October, 1918, on the occasion when I demanded payment of the past-due note."

Appellee George testified as follows:

"At the time I took up these notes in December, 1917, or prior to that, I had never heard anything from Mr. Stark, or from any of my agents regarding the engine not operating properly, or any complaint about the engine at all."

The court submitted to a jury impaneled to try the cause special questions, in answer to which the jury, in effect, made the following answers:

(1) That the engine in controversy was not well made, of good material, and durable if used with proper care.

(2) That the reasonable market value of the engine at Kress, Tex., if it had been as warranted was $3,300.

(3) That the reasonable market value of the engine at Kress, Tex., in the condition in which it was delivered was $1,500.

(4) That some of the parts of said engine were defective in material and workmanship.

(5) That the defendant, Stark, did at some time during the first year the engine was in his possession and use make a demand upon R. B. George or the Twin City Company for replacement of parts of said engine which were defective on account of inferior material or workmanship.

(6) That R. B. George or the Twin City Company did refuse to replace, free of charge, such defective parts.

(7) That the defendant expended the sum of $200 for the purchase of such defective parts.

(8) That after the defendant, Stark, had learned that the engine was defective in the ways alleged in his answer and testified to by him, he used the engine in plowing his ground.

The plaintiff, R. B. George, filed his motion, praying for the rendition of judgment in his favor upon the undisputed evidence, notwithstanding the answers of the jury to questions Nos. 1 to 7, inclusive, for the reason that the plaintiff's cause of action was founded wholly upon instruments in writing admitted to have been executed and delivered by the defendant to the Twin City Company, which had been transferred to plaintiff, under the terms of which the defendant is indebted to plaintiff in the sum sued for, and because there was no evidence showing or tending to show that the Twin City Company or plaintiff had in any manner breached the warranty pleaded by the defendant, and therefore said questions 1 to 7 were immaterial and without evidence calling for their submission, and because the answers of the jury to such questions were immaterial, in that they in no way affected the right of the plaintiff to the recovery prayed for by plaintiff, and because, under the pleading and evidence, no judgment other than one for the plaintiff for the full amount prayed for could be properly rendered. The court sustained said motion in part and rendered judgment as follows:

"It is therefore ordered, adjudged, and decreed by the court that the plaintiff, R. B. George, do have and recover of and from the said L. D. Stark, after allowing the said offset of $320, the net sum of $3,153.22, with 10 per cent. attorney's fees thereon, making a total net sum to be recovered by plaintiff of $3,468.54, with interest thereon from the date hereof at the rate of 10 per cent. per annum until paid."

Judgment was also rendered, foreclosing the mortgage lien as prayed for by the plaintiff. L. D. Stark appealed from the judgment rendered against him, and R. B. George has filed his cross-assignment, complaining of so much of said judgment as awarded to the defendant a recovery of $320 by way of set-off.

It is insisted by appellant that the court erred in not rendering judgment in his favor for the sum of $2,000, upon the findings of the jury, to be offset against the demands of the appellee, such sums to be made up by the two items found by the jury: First, $1,800, the difference between $3,300, the purchase price of the engine in controversy, and $1,500, the market value of said engine at the time of its delivery to him, as found by the jury; and, second, $200, the sum found by the jury as having been paid by him to supply the defective or broken parts of the engine—the foregoing contention being based upon the further contention that the court was without authority to ignore the findings of the jury upon the questions submitted.

It is contended by appellant that the first clause of the warranty hereinbefore set out, is an unconditional warranty that the engine sold to him was well made, of good material, and that it would continue in good condition for one year, if used with proper care; that such clause is an absolute warranty of the quality of the engine, and is not dependent upon or in any way affected by the subsequent provisions of the same. Having so insisted, he further insists that under the warranty, the evidence, and the findings of the jury judgment should have been rendered in his favor for the sum of $2,000 as an offset against the sum adjudged to the plaintiff.

Appellee, R. B. George, contends, among other things, that the warranty under which the engine in controversy was sold provides that appellant should have three days' trial of said engine, and that, if the same failed to work upon such trial made with proper care and under favorable conditions, the-

purchaser should immediately give notice by registered mail or by wire to the Twin City Company at its office in Minneapolis, Minn., and to the agent through whom the engine was purchased, stating wherein the engine failed, and that a failure on the part of appellant to give notice of any defects in the engine within the three days provided for the test would operate as an acceptance of the engine and a complete fulfillment of the warranty; that the undisputed evidence shows that the engine was used for 15 months without any complaint whatever being made thereof to either the Twin City Company or the agent through whom it was sold, and that by the failure to give such notice appellant waived both his right to rescind and his right to recover damages for the alleged breach of warranty on the part of appellee, if any, and therefore the findings of the jury to the questions submitted had no binding effect upon the court, and the court committed no error in rendering judgment for appellee, notwithstanding such findings. He further contends that judgment should have been rendered for him for the full amount sued for, and that no other judgment could be properly rendered under the pleadings and evidence, and therefore the only error committed by the court was in allowing appellant an offset of $320 against the judgment rendered in favor of appellee. After a careful review of all the pleadings and evidence we feel constrained to sustain the contention of appellee.

As we understand the provisions of the warranty in controversy, they are substantially as follows: The Twin City Company, the seller, warranted the engine to be of good material and durable, if used with proper care, for one year; the purchaser was to give it a fair test under favorable conditions, and if, upon such test, it was found that it failed to perform the work for which it was sold, the purchaser was, within three days, to notify the Twin City Company at its office in Minneapolis, Minn., and the agent through whom he purchased, of such failure, stating wherein the engine failed, and that after the receipt of such notice the seller, the Twin City Company, should be allowed a reasonable time to put the engine in good order, and that if the same could not be made to do said work under ordinary conditions, the purchaser should return it to the agent in as good order as when received, except ordinary wear, and that if such return was made, the Twin City Company would either furnish the purchaser another machine, with the warranty as before, or would, at its option, return all cash and notes received in payment for the engine to the purchaser, and that the doing of either by the seller would constitute a settlement in full of the entire transaction, and operate as a release of all claims of both buyer and seller that might arise out of said transaction. It was specially provided in the contract and warranty as follows:

"Failure to give notice within the three days specified shall operate as an acceptance of said machine and a complete fulfillment of the warranty."

The contract of sale also provides that if in one year from date of shipment of the machinery any part shall fail by reason of defective material or workmanship, the Twin City Company will furnish a new part free of charge f. o. b. factory, provided the broken part is delivered to the factory of the company, transportation charges prepaid, with satisfactory evidence that its failure was due to defective material and workmanship.

The undisputed evidence shows that the machine was delivered to appellant in July, 1917; that it was used by him for several months, and that during that time he broke, with said engine, about 600 acres of hard land and planted about 300 acres of wheat; that he never at any time gave either the Twin City Company, or the agent who sold him the engine, any manner of notice that there was any defect in the engine, and that he made no complaint to the Twin City Company, or any of its authorized agents, of the engine, until 15 months after its delivery to him, and not until one of the purchase-money notes was presented him for payment after maturity; that appellant has never made any attempt to return the engine, but, to the contrary, he left it out in the weather until it was badly damaged. While there was evidence that the crank shaft was warped or twisted, and that appellant spent about $200 in the procurement of certain bearings, etc., there was no evidence that either the crank shaft or any of the other parts were defective because of defective material or workmanship; and the undisputed evidence shows that no parts were returned to the factory with request for new parts. Indeed, it shows that no request was made to the seller to furnish any part whatever, because of defects in material or workmanship.

[1] Where the contract of sale and warranty provides for the making of a test of machinery, and that the retention of the machinery after such test shall be deemed the complete fulfillment of the warranty, the buyer, after making such test and using the machine for a long period of time, waives both his right to rescind and his right to damages for an alleged breach of warranty. Mechem on Sales, vol. 2, §§ 1383, 1384, 1396; Bonham, Cotton Co. v. McKellar, 86 Tex. 694, 26 S. W. 1056; Aultmann v. McKinney (Tex. Civ. App.) 26 S. W. 267; Hutches v. Case Co. (Tex. Civ. App.) 35 S. W. 61; Thomas Mfg. Co. v. Griffin, 16 Tex. Civ. App. 188,

40 S. W. 755; Shearer v. Gaar-Scott Co., 41 Tex. Civ. App. 39, 90 S. W. 684; Case Co. v. Hall, 32 Tex. Civ. App. 214, 73 S. W. 835; Haynes v. Plano Mfg. Co., 36 Tex. Civ. App. 567, 82 S. W. 532; Aultman Co. v. York, 1 Tex. Civ. App. 484, 20 S. W. 851; Cameron Steam Pump Co. v. Lubbock (Tex. Civ. App.) 167 S. W. 256; Oltmanns Bro. v. Poland (Tex. Civ. App.) 142 S. W. 654; Mfg Co. v. Stevens (Tex. Civ. App.) 60 S. W. 350; Fetzer v. Haralson (Tex. Civ. App.) 147 S. W. 290; Wilson v. Avery (Tex. Civ. App.) 182 S. W. 884; Board v. Emerson-Brantingham Imp. Co. (Tex. Civ. App.) 203 S. W. 421; Adams v. Crittenden (Tex. Civ. App.) 191 S. W. 833.

In Shearer v. Gaar-Scott Co., 41 Tex. Civ. App. 39, 90 S. W. 684, it was said:

"We are of opinion that upon these facts the trial court did not err in holding that defendant, by his failure to comply with the terms of the contract signed by him, had released plaintiff from all liability upon its warranty. * * * The language of the contract is plain and unambiguous, and by its terms appellant was required, if any defect appeared in the machinery within six days after he began to use it, to immediately notify appellee at its home office of such defect, and appellee must be allowed a reasonable time to remedy such defect, and, if same could not be made to comply with the warranty, it should be returned to the place where it was received by defendant, and written notice of such return given appellee, who would then have the option to either rescind the sale, or to replace the defective machinery with other that fulfilled the terms of the warranty. * * * The trial court finds that notice of the defects in the machinery, which was discovered within six days after the defendant began its use, was not given appellee as required by the contract; that the machinery was not returned to the place where it was received by defendant; and that defendant continued to use it or tried to use it for more than 6 months thereafter, and has never offered to return it to plaintiff. These findings of fact are all sustained by the evidence. Under these facts we think it clear that defendant has released plaintiff from all claims which he might have against it for failure to comply with his warranty. The terms of the contract may be hard and unreasonable but appellant has made it and, in the absence of fraud or mistake in its execution, he must be held bound thereby."

We are of the opinion that under the facts shown the court erred in submitting any issues to the jury, and that it was his duty to instruct the jury to return a verdict for appellee for the full sum sued for.

Findings by the jury that the engine was not well made, of good material, and durable, though used with proper care, that it was not worth the price charged therefor, that some parts thereof were defective in material and workmanship, and that the purchaser did make demand upon the plaintiff or the Twin City Company for replacement of parts of the engine which were defective because made of inferior material or workmanship, would not destroy the right of the plaintiff to recover under the contract, in that the undisputed evidence shows that the purchaser tested the engine for some 15 months, used it in plowing hundreds of acres of land and that during this time he made no complaint to either the Twin City Company or the agent who sold the engine to him that it failed to work, and that he returned no parts to the factory of the seller, with request for replacement of new parts.

[2, 3] We are not overlooking the well-established rule that the judgment must follow the verdict of the jury. This rule, however, requires only that the judgment must be based upon findings material to the matters in controversy, but it does not demand that judgment shall be rendered in accordance with findings of the jury upon facts not material and relevant to the issues as made by the pleadings and evidence and which, though true, would not entitle the party in whose favor they were found to any judgment. When from the pleadings and the undisputed evidence it is apparent that no judgment could be properly rendered for either party upon the findings of the jury, as in this case, it is not error for the court to ignore such findings; and if from the pleadings and evidence no judgment other than the one rendered could be properly rendered, this court will not reverse such judgment because not in conformity to findings of the jury upon immaterial issues. Peterson v. City of Houston (Tex. Civ. App.) 224 S. W. 580, at page 586.

It is clear from what we have said that we have reached the conclusion that the contention of appellant should be overruled; that the cross-assignment of appellee, complaining of the award of $320 to appellant as an offset, should be sustained, and that the judgment of the trial court should be so reformed as to here render judgment for appellee, R. B. George, for the full sum sued for, to wit, $3,788.54, and it is accordingly so ordered.

Reformed and affirmed.